IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| **PRISON LEGAL NEWS, a Project of** | : | |
| **THE HUMAN RIGHTS DEFENSE** | : | |
| **CENTER, a Not for Profit Corporation,** | : | |
| **Incorporated in the State of** | : | |
| **Washington,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | **No. 3:12-CV-00125 (CAR)** |
| **JOE CHAPMAN, the Sheriff of** | : | |
| **Walton County, Georgia, and** | : | |
| **WADE HARRIS, Jail Commander** | : | |
| **for Walton County Jail, in their** | : | |
| **official and individual capacities,** | : | |
| | : | |
| **Defendants.** | : | |

BENCH TRIAL ORDER

Prison Legal News ("PLN") alleges Sheriff Joe Chapman and Jail Commander Major Wade Harris ("Defendants"), in their official and individual capacities, violated PLN's First and Fourteenth Amendment rights by enforcing certain mail policies that unlawfully restricted its means of communicating with individual Walton County Jail inmates. Consequently, PLN requests that the Court issue a declaratory judgment that the challenged policies violate the United States Constitution and permanently enjoin Defendants from enforcing the same. PLN also seeks compensatory, punitive, and

nominal damages for each violation of its constitutional rights, along with court costs and attorney's fees under 42 U.S.C. § 1988.

The Court has long wrestled with these multifaceted issues and carefully crafted its decision in balancing PLN's constitutional rights against the practical concerns and limitations of the Walton County Jail.  The path provided by legal precedent has not been a clear one.  Nonetheless, after considering the evidence and the applicable law, the Court makes the Findings of Fact and Conclusions of Law as stated herein.  The Court grants judgment in favor of Defendants on PLN's First Amendment claim as to Defendants' postcard-only policy.  However, the Court grants judgment in favor of PLN on its First Amendment claim as to Defendants' original publication ban and PLN's Fourteenth Amendment due process claim.

## PROCEDURAL HISTORY

PLN filed suit in this Court on September 21, 2012, with an accompanying motion for preliminary injunction.  Therein, PLN challenged Defendants' publication ban, postcard-only policy, and notice and appeal policy.[1]  The Court ultimately enjoined Defendant from imposing a *de facto* ban on the PLN's periodicals to the extent these mailings did not otherwise threaten the safety, security, or efficiency of the Jail

---

[1] PLN's Complaint separately challenged the Jail's privileged mail policy; however, that issue has since been subsumed under the postcard-only policy challenge.   January 16, 2014 Teleconference, p. 2 [Doc. 65].

and its population.  However, based on the limited record and parties' briefs, the Court could not determine whether the postcard-only policy violated PLN's First Amendment rights or that the Jail's notice and appeal policy provided insufficient procedural due process.[2]

During a telephone conference on January 16, 2014, the parties agreed to address PLN's claims through the following bifurcated proceeding: (1) a bench trial to determine Defendants' liability and PLN's entitlement to injunctive relief; and (2) a jury trial to determine any resultant damages against Defendants in their individual capacities.[3]  Accordingly, the Court conducted a bench trial on February 24, 2014, and thereafter directed PLN to file a post-trial brief and instructed the parties to designate specific evidence for the Court's consideration.  These matters are now ripe for adjudication.

## FINDINGS OF FACT[4]

PLN is a nonprofit organization that publishes and distributes a variety of print materials, including *Prison Legal News*, a monthly periodical intended to address prisoners' rights and educate the public about prison conditions.[5]  Over the last two

---

[2] Order on Mtn. for Prelim. Inj., pp.  14, 20, 22 [Doc. 42].

[3] January 16, 2014 Teleconference, pp. 1-2.

[4] The Court declines to incorporate any facts or conclusions expounded by PLN's or Defendants' experts.  Neither expert assisted the Court, as the trier of fact, in understanding the facts in evidence or determining a fact in issue.  *See generally* Fed. R. Evid. 702(a).

[5] Wright Dep., pp. 9, 14 [Doc. 65]; Bench Trial Transcript, 3:21-7:25.

years, PLN has mailed numerous publications and correspondence to individual inmates at the Walton County Jail (the "Jail").[6]  The Jail is a short-term facility that houses anywhere from 400 to 450 inmates at any given time.[7]

## I.   Censorship of Inmate Mail

Two Jail employees are charged with processing inmate mail.[8]   These employees censor mail in accordance with policies promulgated by the Sheriff of Walton County, Defendant Joe Chapman, and implemented by the Jail Commander, Defendant Wade Harris.[9]

### A.  Postcard-Only Policy

Effective April 8, 2011, the Jail adopted a policy restricting all non-privileged mail to postcards only (the "postcard-only policy").[10]  This policy further provides that postcards are "subject to be read by facility staff" who censor objectionable content pursuant to the Jail's "Censorship Guidelines."[11]   Because the Jail is currently understaffed, the two employees assigned to mailroom duties are also responsible for fulfilling other miscellaneous duties around the Jail.[12]  Since the institution of the postcard-only policy, each employee saves approximately two to three hours per day

---

[6] Wright Decl., ¶ 2 [Doc. 85].
[7] Chapman Dep., pp. 54, 63-64 [Doc. 71].
[8] Grabowski Dep., pp. 7, 9, 17 [Doc. 70].
[9] *See* Chapman Dep., pp. 12-13, 22-23, 45-46; Harris Dep., p. 151 [Doc. 69].
[10] Original Jail P&P 5.16(I) [Doc. 7-7].
[11] *Id.* at 5.16(II)N.
[12] Chapman Dep., pp. 34-35, 38; Grabowski Dep., pp. 16-17.

processing inmate mail.[13]

### B.  Publication Policy

Also effective April 8, 2011, the Jail adopted a policy prohibiting inmates from receiving publications "of any kind" through the mail.[14]  Instead, the policy noted that "[b]ooks are available on a regular basis from the facility library."[15]

### C.  Notice and Appeal Policy

When censoring postcards, the Guidelines direct the Jail employee to forward the correspondence to Defendant Harris or his designee for review before notifying both the addressee-inmate and author of the Jail's censorship.  Thereafter, the author has seven days to appeal the decision through a due process hearing with Defendant Harris or another uninterested third party who did not participate in the original censorship decision.[16]  Defendants admit that "[t]he Jail does not have a policy that requires a sender to be notified every time the Jail decides not to deliver to an inmate a book, magazine, or nonpostcard [sic], i.e., multi-page, letter from the sender."[17]

## II.   Censorship of PLN's Mailings

The Jail has censored a majority of PLN's mail pursuant to these mail policies, including numerous periodicals, information subscription brochures, book catalogs,

---

[13] Grabowski Decl., ¶ 5 [Doc. 21]; *see* Grabowski Dep., pp. 17, 62.
[14] *Id.* at 5.16(II)E.
[15] *Id.*
[16] *Id.* at 5.16(II)N.
[17] Defendant Chapman's Response to Requests for Admissions, ¶ 5 [Doc. 71-1].

book offers, court rulings, letters from the editor, letters from PLN's attorney, and subscription renewal letters.[18]  One-third of PLN's mail has been returned through the U.S. Postal Service's "Return to Sender" service.  The disposition of the remaining two-thirds of the mail is unknown.[19]

## III.   Defendants' Post-Litigation Revised Publication Policy

On October 1, 2012, ten days after PLN filed suit in this Court, Defendants revised the contested publication policy to allow inmates to individually order softbound books directly from a bookstore or publisher.[20]  However, inmates are still prohibited from receiving periodicals, magazines, and newspapers on an individual basis.[21]  Instead, the policy states that magazines, newspapers, and periodicals are "provided by Inmate Services on a regular schedule."[22]  In practice, a Jail employee selects a number of magazines from a local retailer each month.[23]  Although unclear, it appears the Jail originally purchased 6-7 magazines to be rotated among the cell blocks on a monthly basis but now purchases 12 magazines—one for each of the cell blocks.[24]  The Jail has not purchased *Prison Legal News*.[25]

---

[18] Wright Decl., ¶ 5 [Doc. 85].

[19] Wright Decl., ¶ 6 [Doc. 85].

[20] *See* Revised Jail P&P 5.16, 5.25 [Doc. 21].

[21] *Id.* at P&P 5.16(II)E.

[22] *Id.*

[23] Harris Dep., pp. 23-24, 32; Errata, p. 2.

[24] Harris Dep., pp. 23-24, 32; Bench Trial Transcript, 59:1-4, 74:20-24, 83:23-25.

[25] Bench Trial Transcript, 33:7-9.

## CONCLUSIONS OF LAW

PLN claims Defendants' mail policies unlawfully infringe upon its right to communicate with the Jail's inmate population and its right to appeal the Jail's censorship decisions in violation of the First and Fourteenth Amendments to the United States Constitution.   PLN therefore requests that the Court (a) issue a permanent injunction against Defendants in their official capacities requiring them to cease enforcement of the challenged provisions of its mail policy and afford PLN constitutional due process; (b) issue a declaratory judgment that the challenged policies and procedures violate the United States Constitution; (c) award compensatory, punitive, and nominal damages for each violation of PLN's constitutional rights; and (d) award other appropriate costs and fees, including pre- and post-judgment interest and attorney's fees pursuant to 42 U.S.C. § 1988.

In response, Defendants contend that each of the challenged policies survives constitutional scrutiny.   Alternatively, Defendants assert that several of PLN's concerns have been resolved by the Jail's revised mail policies.  Finally, Defendants claim they are entitled to qualified immunity in their individual capacities because their promulgation and enforcement of the contested Jail policies did not violate a clearly established constitutional right.  The Court addresses each of these arguments in turn.

I.    <u>**First Amendment Claims**</u>

PLN claims Defendants' mail policies unconstitutionally restrict its freedom to communicate with the Jail's population by imposing arbitrary and unnecessary restrictions on PLN's correspondence.  Although prison walls do not extinguish a free citizen's or even a publisher's right to communicate with inmates, this right is not absolute.[26]  Instead, these First Amendment interests must be balanced against the unique conditions and needs of the penal system.[27]

Courts have long recognized "(1) the difficulty of running a prison, (2) the separation of powers concerns when a federal court assumes a function (prison administration) entrusted to the legislative and executive branches, and (3) the need for federal courts to accord deference to state authorities."[28]  In short, "courts are ill equipped to deal with the increasingly urgent problems of prison administration," and "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison

---

[26] *See Thornburgh v. Abbot*, 490 U.S. 401, 407-08 (1989) ("[T]here is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view[,] have a legitimate First Amendment interest in access to prisoners."); *Turner v. Safley*, 482 U.S. 78, 84-85 (1987).

[27] *Turner*, 482 U.S. at 84-85.

[28] *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004); *see also Bell v. Wolfish*, 441 U.S. 520, 548 (1979).

administration."[29]   The Court must therefore afford considerable deference to "the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."[30]

In light of these circumstances, the United States Supreme Court has concluded that a prison regulation may impinge on a free citizen's or entity's freedom of speech if the Court determines that "it is reasonably related to legitimate penological interests."[31]  To determine if a jail's content-neutral regulation is "reasonably related to legitimate penological interests," the Court examines the four critical factors outlined by the Supreme Court in *Turner v. Safley*:[32] (1) whether there is a legitimate and neutral connection between the regulation and the asserted governmental interest and the policy; (2) whether there are alternative means of exercising the constitutional right; (3) any effect accommodating the right would have on guards and inmates; and (4) the absence or existence of ready alternatives.[33]  "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."[34] Moreover, a court does not have to agree with prison officials' proffered interest for a

---

[29] *Turner*, 482 U.S. at 84, 89.
[30] *Thornburgh*, 490 U.S. at 408.
[31] *Turner*, 482 U.S. at 89.
[32] *Id*.; *see Thornburgh*, 490 U.S. at 415.
[33] *Thornburgh*, 490 U.S. at 414; *Turner*, 482 U.S. at 89.
[34] *Turner*, 482 U.S. at 90-91.

policy to pass constitutional scrutiny. "The inquiry under *Turner* is not whether the policy actually serves a penological interest, but rather whether it was rational for jail officials to believe that it would."[35]

Although courts afford prison administrators "considerable deference," the *Turner* test "is not toothless."[36]  As the Supreme Court noted in *Beard v. Banks*,[37] it "requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective"; they must also "show[ ] a reasonable relation" in light of the "importance of the rights … at issue."[38]  Thus, a prison regulation "cannot be sustained when the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary and irrational."[39]  With this framework in mind, the Court addresses each of the contested mail policies.

### A. *Postcard-Only Policy*

Defendants' postcard-only policy passes constitutional muster.  The policy satisfies the first *Turner* factor because there is a rational connection between the postcard-only policy and the Jail's legitimate penological interests in security and

---

[35] *Covell v. Arpaio*, 662 F. Supp. 2d 1146, 1152-53 (D. Ariz. 2009) (citations omitted).
[36] *Thornburgh*, 490 U.S. at 407-408, 414.
[37] 548 U.S. 521 (2006).
[38] *Id.* at 533, 535.
[39] *Turner*, 482 U.S. at 89-90.

efficiency.[40]   First, by limiting the space in which inmates and their correspondents may converse, this policy inherently impedes the sender's and recipient's ability to conceal illegal schemes in lengthy correspondence, including plans to escape, plans involving assaults on inmates, and plans to introduce illegal drugs, weapons, or other contraband into the facility.  Moreover, this policy reduces the likelihood that inmates will receive contraband that may be transmitted through multi-paged missives.  Finally, the postcard-only policy conserves the Jail's already limited resources.

In opposition, PLN asserts Defendants cannot identify a single incident prior to the institution of the postcard-only policy when contraband successfully entered the Jail through multi-page letters.  However, prison officials "need not demonstrate an actual danger in order to support the reasonableness of their determinations.  It is enough to show that a potential danger exists."[41]  There is a common sense connection between a jail goal of reducing contraband and limiting the number of pages of correspondence.[42]  As the United States District Court for the Southern District of Florida has observed,

> Sealed envelopes provide a greater opportunity for the introduction of drugs and weapons into jail facilities than postcards because envelopes can contain multiple pages of paper with folds and creases that lend

---

[40] Harris Dep., pp. 126-27.

[41] *Prison Legal News v. Cheshire*, No. 1:04CV173DAK, 2006 WL 1868307, at *6 (6th Cir. 2006) (quoting *Espinoza v. Wilson*, 814 F.2d 1093, 1097-98 (6th Cir. 1987)) (internal quotation marks omitted).

[42] *Prison Legal News v. Babeu*, 933 F. Supp. 2d 1188, 1203 (D. Ariz. 2013).

11

themselves to smuggling contraband.  Postcards have no folds or creases.
Even if a jail staffer has to remove the stamp from a postcard to make sure
no contraband lies beneath, that effort pales in comparison to the effort
necessary to inspect a sealed letter.[43]

Moreover, since the institution of the postcard-only policy, each of the two Jail
employees assigned to mailroom duties saves approximately two to three hours per
day screening inmate mail.[44]  This permits the employees to perform their other duties,
such as transporting inmates, circulating library materials, and passing out various
items.[45]  In short, Defendants' policy advances their content-neutral goal of conserving
the Jail's scarce resources, which in turn bears on prison security.   Accordingly, the
first *Turner* factor weighs in Defendants' favor.

The second *Turner* factor also weighs in Defendants' favor.  This factor directs
the Court to consider PLN's alternative options for exercising its First Amendment
rights under the contested policy.[46]  "Where 'other avenues' remain available for the
exercise of the asserted right, courts should be particularly conscious of the 'measure
of  deference  owed  to  corrections  officials  …  in  gauging  the  validity  of  the
regulation.'"[47]   Further,  the  Court  must  view  the  right  in  question  "sensibly  and

---

[43] *Althouse v. Palm Beach Cnty. Sheriff's Office*, No. 12-80135-CIV, 2013 WL 536072 (S.D. Fla. Feb.
12, 2013).
[44] Grabowski Decl, ¶ 5 [Doc. 21]; *see* Grabowski Dep., pp. 17, 62.
[45] Grabowski Dep., pp. 7, 62.
[46] *Turner*, 482 U.S. at 90.
[47] *Id.*

expansively."[48]

In the context of the postcard-only policy, the right in question is primarily PLN's ability to communicate with inmates through its subscription "info packs" and various multi-paged letters from its attorney and editor. While the postcard-only policy may be a frustrating and limiting alternative from PLN's perspective, "alternatives need not be ideal; they need only be available."[49] To the extent PLN claims that the postcard-only policy restricts its ability to communicate without any semblance of privacy, its argument must fail. Inmates' mail has always been subject to search, and Jail officials are free to inspect non-privileged conversations between inmates and their correspondents.[50] Moreover, PLN's attorneys and editor may choose to converse with inmates by phone. Accordingly, the Court concludes that PLN has adequate avenues for exercising its asserted right.

In addressing the third *Turner* factor, the Court must assess "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of resources generally."[51] The Supreme Court has cautioned courts to give due consideration to jail officials "[w]hen the accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison

---

[48] *Thornburgh*, 490 U.S. at 417 (citation omitted).

[49] *Overton v. Bazzetta*, 539 U.S. 126, 127 (2003).

[50] *See, e.g., United States v. Mills*, 704 F.2d 1553, 1560-61 (11th Cir. 1983).

[51] *Turner*, 482 U.S. at 90.

staff."[52]    Defendants contend that allowing multi-page letters would significantly increase the amount of time Jail employees spend processing inmate mail, which would detract from their ability to accomplish other responsibilities that ensure a safe and secure jail.[53]  The Court agrees.

The postcard-only policy has decreased the time spent processing mail by four to six hours each day, allowing two Jail employees to perform other duties as needed.[54] In an understaffed facility like the Walton County Jail, the Court cannot conclude this extra time would not have a "ripple effect" on safety and security.[55]  The Court is not persuaded otherwise the fact that the Federal Bureau of Prisons' Correspondence Policy permits inmates to receive traditional mail in envelopes.[56]  The Court's analysis necessarily turns on the individual conditions and needs of the Walton County Jail, not a general policy advanced by a federal institution with different penological concerns and resources.   Therefore, the third factor also weighs in favor of Defendants.[57]

Finally, the fourth *Turner* factor requires the Court to determine whether the

---

[52] *Id.*

[53] *See also Daniels v. Harris*, No. 3:11-CV-45 (CAR), 2010 WL 3901646, at *2 (M.D. Ga. Aug. 8, 2012).

[54] *See* Grabowski Decl., ¶ 5; Grabowski Dep., pp. 17, 62.

[55] Chapman Dep., pp. 34-35, 38; *see, e.g., Prison Legal News v. Bezotte*, No. 11-CV-13460, 2013 WL 1316714, at *5 (E.D. Mich. Mar. 29, 2013) (concluding that four hours of time was not *de minimis).*

[56] *See* Federal Bureau of Prisons Correspondence Policy [Doc. 96-1].

[57] *See, e.g., Hrdlicka v. Cogbill*, No. C 04-3020 MJJ, 2006 WL 2560790, at *10-12 (N.D. Cal. Sept. 1, 2006); *Thornley v. Edwards*, CIV. No. A86-1503, 1988 WL 188333, at *8 (M.D. Penn. Mar. 29, 1988).

regulation is an exaggerated response to the Jail's expressed concerns.  Accordingly, the burden is on PLN to show obvious, easy alternatives that fully accommodate the publisher's right at *de minimis* cost to the Jail.[58]  PLN offers two alternatives to the postcard-only policy.  The first would require the Jail to "continue to inspect all incoming mail for objectionable content as the Jail has consistently done."[59]  Second, PLN contends that Defendants can enforce its preexisting disciplinary measures against inmates who abuse the mail in lieu of the postcard-only policy.[60]  It is not obvious, however, that these alternatives would accommodate PLN's asserted right at a *de minimis* cost to Walton County Jail.  Rather, under PLN's proposal, Jail employees would still have to open, inspect, and monitor sealed envelopes with multi-page letters—the same concerns the postcard-only policy was meant to address.  As such, PLN has failed to carry its burden under the fourth *Turner* factor, and the Court concludes that the postcard-only policy does not violate PLN's rights under the First Amendment.[61]

### B. *Publication Policy*

Unlike the postcard-only policy, Defendants' original publication policy does

---

[58] *See Turner*, 482 U.S. at 90-91 ("This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.").

[59] Mtn. for Prelim. Inj. at 14 [Doc. 24].

[60] Inmate Handbook XI, pp. 14-20, PLN Tr. Ex. 6.

[61] *See Turner*, 482 U.S. at 90-91; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987) (noting that the burden is not on the prison official to disprove the availability of alternatives).

not pass constitutional muster.  Defendants contend that their total prohibition on the individual receipt of publications through the mail limits the amount of paper in each inmate's cell, thereby reducing the risk of fire hazards, sanitation concerns, and the concealment of weapons.  While these are all legitimate penological objectives, the Court cannot conclude they are rationally advanced by Defendants' original policy.

Several courts have recognized the tenuous connection between prohibitions on inmates' receipt of publications and fire or sanitation concerns.[62]  Courts generally take issue with this rationale because inmates are permitted to have any number of other materials in their cells that pose at least an equal threat to the security and safety of the jail.[63]  The same holds true in this case.  Defendants' policies permit inmates to keep legal papers, five or fewer personal items, one religious text, one library book, and other flammable materials in their cells.[64]  Based on these circumstances, the Court concludes that "inmates who wish to set fires can and will do so, whether or not they have subscription publications for fuel."[65]  This same rationale applies to inmates' ability to conceal weapons with their cells' contents.[66]

Likewise, the Court is not persuaded that lifting the publication ban would

---

[62] *See, e.g., Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986) (sanitation); *Kincaid v. Rusk*, 670 F.2d 737, 743 (7th Cir. 1982) (fire); *Spellman v. Hopper*, 95 F. Supp. 2d 1267, 1273-76 (M.D. Ala. 1999) (sanitation and fire);

[63] *See, e.g., Spellman*, 95 F. Supp. 2d at 1273.

[64] Inmate Handbook IV, pp. 5-6.

[65] *Spellman*, 95 F. Supp. 2d at 1273.

[66] *Id.* at 1278-79.

16

cause a hazardous influx of publications.  First, Defendants have not reported any such issue since they lifted the ban in accordance with their own revised policy and the Court's preliminary injunction.  Second, other Jail policies address this concern. Jail officials are directed to confiscate inmates' possessions or other contents from their cells if the accumulation is "considered excessive and constitute[s] a safety, security or health hazard."[67]   Inmates are also required to participate in a "daily" cleaning regimen "within [their] housing and common areas" or risk being subject to disciplinary action.[68]

While the Court is mindful that "responsible prison officials must be permitted to take reasonable steps to forestall" a threat to institutional security,[69] "undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression."[70]  Where, as here, the plaintiff has demonstrated the lack of a rational connection between the maintenance of institutional security and a total prohibition on individual receipt of publications, deference to prison policy is not warranted.

Although the first factor weighs heavily in PLN's favor, the second *Turner* factor favors Defendants.  The Court agrees with PLN's assertion that traditional

---

[67] Inmate Handbook IV, p. 6.
[68] *Id.* at VIII, p. 11.
[69] *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132-33 (1977).
[70] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

forms of in-jail communication such as phone calls and in-person visits are not suitable alternatives for the educational materials PLN seeks to provide through its periodicals and books.  Likewise, other forms of media, like radio and television, cannot replace the written word.[71]  However, as noted above, PLN's First Amendment interest "must be viewed sensibly and expansively."[72]  As such, the Court must consider all reasonable alternatives to PLN's preferred form of communication.  To that end, the Court notes that Defendants accept book donations to the Jail library, which would permit PLN to communicate its core messages to inmates.[73]  Although this is a narrow alternative, it is reasonably available to PLN considering the fact that it often disseminates its publications free of charge.[74]

Closely mirroring the first factor, the third and fourth *Turner* factors weigh in PLN's favor.  As discussed above, lifting the publication ban has had little or no impact on Defendants' specific concerns, since the Jail already has other, constitutionally valid policies that effectively address fire hazards, sanitation, and weapons concealment.  Moreover, by enforcing these preexisting policies, Defendants can accommodate PLN's constitutional rights at a *de minimis* cost without otherwise altering the Jail's existing rules.  Thus, PLN has demonstrated that Defendants'

---

[71] *See Jacklovich*, 392 F.3d at 431; *Mann v. Smith*, 796 F.2d 79, 83 (5th Cir. 1986).
[72] *Thornburgh*, 490 U.S. at 417.
[73] Chapman Dep., pp. 88-89; Grabowski Dep., p. 44; Harris Dep., pp. 89-90.
[74] *See* Bench Trial Transcript, 47:9-21.

publication ban represents an exaggerated response to their asserted penological concerns.[75]

Based on the foregoing analysis, the Court concludes that the Jail's original publication ban offends the Constitution even under the most deferential standard. The fact that the second *Turner* factor weights in Defendants' favor is not sufficient to negate the merits of PLN's claim. Defendants' failure to demonstrate a rational connection between the publication ban and its asserted penological interests "renders the regulation unconstitutional without regard to the remaining three factors."[76]

## II.   Fourteenth Amendment Due Process Claim

Finally, the Court concludes that Defendants failed to provide a constitutionally adequate, minimum degree of due process to PLN when censoring its mailings.[77]  To prove a procedural due process violation PLN must demonstrate (1) the deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process.[78]  As previously discussed, "publishers (including advertisers) have a First Amendment right to access inmates."[79]  Therefore, "the decision to censor or withhold delivery of a … letter must be accompanied by

---

[75] *See Spellman*, 95 F. Supp. 2d at 1272-87.
[76] *Jones v. Caruso*, 569 F.3d 258, 267 (6th Cir. 2009).
[77] *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).
[78] *Arrington v. Helms*, 438 F.3d 1336, 1348-48 (11th Cir. 2006).
[79] *Perry v. Sec'y, Fla. Dep't of Corrs.*, 664 F.3d 1359, 1368 (11th Cir. 2011).

minimum procedural safeguards."[80]   The parties do not dispute that Defendants'

promulgation and enforcement of the Jail policies in question constitute state action.

Accordingly, the only remaining question is whether Defendants' censorship policies

and practices constitute constitutionally-inadequate process.

To answer this question, Eleventh Circuit precedent directs this Court to apply

the heightened due process standard established by the Supreme Court in *Procunier v.*

*Martinez*.[81]   Accordingly, to pass constitutional muster, *Martinez* requires the

following: (1) appropriate notice; (2) a reasonable opportunity to challenge the initial

decision; and (3) an ultimate decision by a disinterested party not privy to the initial

censorship decision.[82]   The Court is unpersuaded by Defendants' argument that the

*Martinez* standard does not apply in light of the Eleventh Circuit's recent decision in

*Perry v. Secretary, Florida Department of Corrections*,[83] which approved a lower standard

---

[80] *Procunier v. Martinez*, 416 U.S. 396, 417 (1974).

[81] 416 U.S. 396 (1974); *Perry*, 664 F.3d at 1368.   The Court questions the propriety of this approach in light of Justice Kennedy's admonition that it is "quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights."   *Washington v. Harper*, 494 U.S. 201 (1990) (applying the *Turner* standard to due process claims); *Prison Legal News v. Livingston*, 683 F.3d 201, 223 (5th Cir. 2012) (applying the *Turner* standard to PLN's procedural due process claim in light of *Washington*).

[82] *Martinez*, 416 U.S. at 418-19; *see also Guajardo v. Estelle*, 580 F.2d 748, 762 n.10 (1978), *overruled on other grounds by Thornburgh*, 490 U.S. at 423-24.   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[83] 664 F.3d 1359 (11th Cir. 2011).

of procedural due process for "mass mailings."[84]  The record in this case demonstrates that PLN attempts to communicate with inmates on an individual basis; it does not send mail *en masse* as the plaintiff attempted in *Perry*.  Defendants also attempt to draw a distinction between the content-based censorship *Martinez* and the form-based censorship in the instant case.  However, they offer no authority for drawing such distinction, and the Court is not aware of any.  Accordingly, the Court must analyze the Jail's censorship procedure under *Martinez*.

The Jail's censorship procedure is fundamentally flawed because it does not provide appropriate notice and appeal procedures for non-postcard mail.  The Jail's current "Censorship Guidelines" direct the Jail Commander, Defendant Harris, or his "designee" to "send notice to the inmate and author of the <u>post card</u>, whether it was an inmate or outside correspondent, that incoming or outgoing mail was censored."[85]  Thereafter, "the author is to be provided seven calendar days to protest the censorship[.] … A due process hearing must be held before a person other than the person who made the original censorship decision."[86]  Finally, Defendant Harris or his designee must "respond to the appellant's protest within ten calendar days."[87]  The

---

[84] *Id.* at 1368.
[85] Original Jail P&P 5.16(II)N.6 [Doc. 7-7] (emphasis added).
[86] *Id.* at N.8.
[87] *Id.* at N.9.

same protections do not extend to non-postcard mail.[88]

Moreover, Defendants admit that "[t]he Jail does not have a policy that requires a sender to be notified every time the Jail decides not to deliver to an inmate a book, magazine, or nonpostcard [*sic*], i.e., multi-page, letter from the sender."[89]  Further, the evidence shows that PLN has only recovered one-third of its censored mail through the U.S. Postal Service's "Return to Sender" service.  The disposition of the remaining two-thirds of the mail is unknown.[90]  Given these two key facts, the Court draws the reasonable conclusion that the Jail does not provide consistent notice and appeal procedures when it rejects non-postcard mail.  This is in direct contravention of *Martinez*'s explicit requirements.  Consequently, PLN has successfully established that the Jail's notice and appeal policy violates its procedural due process rights.

## III.   PLN's Requests for Relief

Because the Court has found that the Jail's individual publication ban violates PLN's First Amendment rights, and the Jail's notice and appeal policy violates PLN's Fourteenth Amendment procedural due process rights, the Court must address whether PLN is entitled to any relief.

### a)  *Damages*

To determine whether PLN is entitled to any monetary damages, the Court

---

[88] *See Martinez*, 416 U.S. at 418-19.
[89] Defendant Chapman's Response to Requests for Admissions, ¶ 5 [Doc. 71-1].
[90] Wright Decl., ¶ 6 [Doc. 85].

must first determine whether Defendants, in their individual capacities, are shielded by the doctrine of qualified immunity.[91]   "Qualified immunity offers complete protection for public officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[92]

For qualified immunity to attach, a public official must first prove that he was acting within the scope of his discretionary authority when the wrongful act occurred.[93]  This threshold burden is easily satisfied; a defendant need only show that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.[94]  Next, the burden shifts to the plaintiff to establish that the official's conduct violated a constitutional right, and the constitutional right in question must have been clearly established at the time of the violation.[95]  Courts need not consider the two prongs of the analysis in sequence, however, and a failure to

---

[91] "Because qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." *Ratlif v. DeKalb County*, 62 F.3d 338, 340 n. 4 (11th Cir.1995); *accord Swint v. City of Wadley*, 51 F.3d 988, 1001 (11th Cir. 1995); *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir.1995).

[92] *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (internal quotation marks omitted).

[93] *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

[94] *See Harbert Int'l v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).

[95] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

establish either prong requires the claim to be dismissed.[96]

In determining whether a constitutional right is clearly established, the Court looks to binding precedent from the Supreme Court of the United States, the United States Court of Appeals for the Eleventh Circuit, and, in appropriate circumstances, a state's highest court.[97]   An official's conduct is evaluated according to "objective legal reasonableness"[98] and "must be undertaken in light of the specific context of the case, not as a broad general proposition."[99]   That is, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.[100]   "This is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent."[101]   However, the Eleventh Circuit has noted that qualified immunity generally shields "all but the plainly incompetent or one who is knowingly violating the federal law."[102]

In this case, it is exceedingly clear that Defendants were acting within the scope of their discretionary authority in promulgating and enforcing Jail policies.

---

[96] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[97] *See Courson v. McMillian*, 939 F. 2d 1479, 1497-98 (11th Cir. 1991).

[98] *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).

[99] *Saucier*, 533 U.S. at 201.

[100] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[101] *Id.* (internal citation omitted).

[102] *Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009) (internal citation omitted).

Accordingly, the burden shifts to PLN to demonstrate that qualified immunity does not apply.

### 1. Publication Policy

Although Defendants' publication ban violates PLN's First Amendment rights, PLN fails to demonstrate that the illegality of Defendants' actions was clearly established by relevant Supreme Court or Eleventh Circuit precedent.   PLN largely relies on authority outside the Eleventh Circuit in support of its argument; however, these cases have no bearing on the Court's qualified immunity analysis.   The Eleventh Circuit "has said clearly, consistently, and on numerous occasions that we may only consider the precedent of these courts in determining whether case law has 'clearly established' a right for qualified immunity purposes."[103]

PLN's reliance on the Eleventh Circuit's decision in *Owen v. Wille*[104] is misplaced. Therein, Duane Owen claimed that officials at the Palm Beach County Detention Facility violated his First Amendment rights by denying him access to certain publications that contained nude photos.  In response, defendants explained that they banned sexually explicit materials for legitimate penological reasons and provided internal review for any decisions prohibiting a prisoner from receiving a specific

---

[103] *Poulakis v. Rogers*, 341 F. App'x 523, 527-28 (11th Cir. 2009) (listing relevant cases).
[104] 117 F.3d 1235 (11th Cir. 1997).

publication.  During oral argument, defense counsel conceded that a blanket ban on nude photographs would be unconstitutional.[105]  Because the policy at issue in *Owen*, which the Eleventh Circuit upheld, was not a blanket ban, the Eleventh Circuit's acknowledgment of defense counsel's concession is dicta.[106]  "The law cannot be established by dicta.  Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law."[107]

PLN's remaining citations to pre-*Turner* cases and sole citation to a post-*Turner* Supreme Court case are equally misguided.  The majority of PLN's cited cases predate *Turner* and therefore applied a less deferential approach to prison regulations. [108] Consequently, a prison regulation on incoming materials that would have been unconstitutional under *Martinez* could nonetheless be permissible under *Turner*.  PLN's sole citation to Supreme Court authority post-*Turner*, *Thornburgh v. Abbott*,[109] stands for the simple proposition that publishers have a First Amendment right to communicate

---

[105] *Id*. at 1237 n.4.

[106] *Gray v. Cannon*, 974 F. Supp. 2d 1150, 1162 (N.D. Ill. 2013).

[107] *Hamilton v. Cannon*, 80 F.3d 1525, 1530 (11th Cir. 1996); *see also In re United States*, 60 F.3d 729, 731 (11th Cir. 1995) ("Statements of dicta are not part of the law of the case."); *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992) ("[D]icta is inherently unreliable for what a court will don once faced with a question squarely and once its best thoughts, along with briefs and oral argument, are focused on the precise issue.") (Edmonson, J., concurring).

[108] *See Thornburgh*, 490 U.S. at 409.

[109] *Id*.

with inmates subject to the *Turner* reasonableness standard.[110]   Accordingly, these cases did not provide Defendants with fair notice that their publication ban was constitutionally deficient given their own penological interests and the current state of the law.

Indeed, the very nature of the fact-specific *Turner* analysis tends to undermine PLN's position.  For example, in *Beard v. Banks*,[111] the Supreme Court considered a First Amendment challenge to a Pennsylvania Department of Corrections ("DOC") policy that wholly denied certain inmates access to newspapers, magazines, and photographs.[112]  The Secretary of the DOC offered several justifications for the policy, "including the need to motivate better behavior on the part of particularly difficult prisoners, the need to minimize the amount of property they control in their cells, and the need to ensure prison safety, by, for example, diminishing the amount of material a prisoner might use to start a cell fire."[113]  Because the Supreme Court found the publication ban was reasonably related to the DOC's legitimate penological purpose of incentivizing better behavior, it did not reach the remaining justifications, which largely mirror Defendants' own.  Although the Supreme Court noted that "if faced with

---

[110] *Id.* at 408.
[111] 548 U.S. 521 (2006).
[112] *Id.* at 524-25.
[113] *Id.* at 530.

evidence … [of] a *de facto* permanent ban … we <u>might</u> reach a different conclusion in a challenge to a particular application of the regulation," this ambiguous dictum did not put Defendants on fair notice that their own rationale was unconstitutional.[114]

Based on the foregoing precedent, the Court concludes that Defendants' policy was not so far-fetched that its illegality was necessarily obvious to a reasonable prison official.  Rather, it was based on content-neutral criteria and left little discretion for Jail officials.  Further, the policy was ostensibly grounded in concerns for prison order and security.  In short, the unlawfulness of the publication ban was not clearly established.  Defendants are therefore entitled to qualified immunity as to this First Amendment claim.

### 2. Procedural Due Process

The Jail's notice and appeal policy violates PLN's Fourteenth Amendment rights by failing to provide PLN with minimum procedural due process.  As discussed above, *Martinez* set forth the three safeguards required each time mail is censored by a correctional facility: (1) notice; (2) an opportunity to protest that decision; and (3) referral to a prison official other than the original decisionmaker.[115]  This case, decided almost forty years ago, clearly and explicitly established the minimum procedural

---

[114] *Id.* at 535 (quoting *Overton,* 539 U.S. at 134.) (emphasis added).
[115] *Martinez*, 416 U.S. at 402.

process a jail must provide under the Fourteenth Amendment in the context of mail censorship.   Here, Defendants failed to provide PLN with <u>any</u> constitutionally-required process for approximately two-thirds of its censored non-postcard mail.   A reasonable official in Defendants' position would have understood that this policy violated procedural due process.   Accordingly, Defendants are not shielded by qualified immunity, and PLN is entitled to recover damages for this constitutional violation.

**b)** *Equitable Relief*

Finally, the Court must decide whether to issue injunctive or declaratory relief for Defendants' unconstitutional publication policy and notice and appeal policy. Before reaching this matter, however, the Court must first assess whether Defendants' revised publication policy and practices render PLN's request for relief moot.   The Court does not address the constitutionality of the revisions, however, because PLN did not challenge the revised policy in an amended complaint.[116]

**1.   Defendants' Mootness Defense**

"[A] federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the

---

[116] *See* Fed. R. Civ. P. 15. *Cf. Prison Legal News v. McDonough*, 200 F. App'x 873, 878 (11th Cir. 2006) (declining to offer opinion on constitutionality of department of corrections revised rule).

matter in issue in the case before it."[117]  A claim is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."[118]  In other words, "[i]f events that occur subsequent to the filing of a lawsuit … deprive the court of the ability to give the plaintiff … meaningful relief, then the case is moot and must be dismissed."[119]  Indeed, mootness deprives a court of its jurisdiction as "[a]ny decision on the merits of a moot case or issue would be an impermissible advisory opinion."[120]

As a general rule, a "defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case."[121]  Rather, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."[122]  However, the Eleventh Circuit has often given government actors "more leeway than private parties in the presumption that they are unlikely to resume illegal

---

[117] *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quotation marks omitted).
[118] *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (internal quotation marks and citation omitted).
[119] *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335-36 (11th Cir. 2001) (per curiam).
[120] *Id.*
[121] *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 174 (2000).
[122] *Id.* at 190.

activities" because of their role as public servants—not self-interested private parties.[123] The Eleventh Circuit has called this a "rebuttable presumption" or a "lesser burden."[124] In general, "[t]his presumption is particularly warranted in cases where the government repealed or amended a challenged statute or policy—often a clear indicator of unambiguous termination."[125]

"[O]nce a government actor establishes unambiguous termination of the challenged conduct, the controversy will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated."[126]   In determining whether the government actor has carried his initial burden, the Court considers among other factors (1) "whether the termination of the offending conduct was unambiguous;" (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction;" and (3) "whether the government has consistently applied a new policy or adhered to a new course of conduct."[127]   "The timing and content of the cessation decision are also relevant in evaluating whether the defendant's stopping of the

---

[123] *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014).
[124] *Id.* (internal quotations omitted).
[125] *Id.*
[126] *Id.* (internal quotation omitted).
[127] *Id.* at 1322-23 (internal quotations and quotation marks omitted).

challenged conduct is sufficiently unambiguous."[128]   A court is "more likely to find a reasonable expectation of recurrence when the challenged behavior constituted a continuing practice or was otherwise deliberate."[129]

Having considered these factors, the Court concludes that Defendants have not unambiguously terminated the publication policy that deprived PLN of its constitutional rights; therefore PLN's request for equitable relief is not moot.  Although Defendants have memorialized their revised publication policy in written form, it is not absolutely clear that their challenged conduct has permanently ceased.  To begin, the timing of Defendants' policy changes creates ambiguity.[130]  The policy changes were not made before litigation was threatened, but after PLN brought suit.[131]  Consequently, this fact suggests that Defendants "changed course simply to deprive the court of jurisdiction, which itself prevents us from finding the controversy moot."[132]

Further, the Court has no means of determining whether any of the aforementioned changes were the result of substantial deliberation.  Defendants did not

---

[128] *Id.*

[129] *Id.* at 1323.

[130] *Rich  v. Sec'y, Fla. Dep't. of Corrs.*, 716 F.3d 525, 531-32 (11th Cir. 2013).

[131] *See* Revised Jail P&P 5.16 [Doc 21, pp. 39-42]; *Jager v. Douglas Cnty. Sch. Dist.*, 862 F.2d 824, 833-34 (11th Cir. 1989) (finding a claim was not mooted by the school district's voluntary cessation of the challenged activity in part because the change was only made when there was an "imminent threat of [a] lawsuit").

[132] *Harrell v. The Florida Bar*, 608 F.3d 1241, 1267 (11th Cir. 2010).

provide any insight into their deliberation process; they offered only vague explanations for their policy changes.  When one Jail employee, Captain John Minton, was questioned about the revised publication policy, Minton vaguely responded that "[i]t had come up that we were looking into this and maybe ordering some magazine subscriptions.  And so I said, well, let me do a survey and see what they want to get and I got the go-ahead."[133]   However, Captain Minton could not recall who came up with the idea for the survey or whether it had anything to do with the instant action.[134]  "As a result, we have no idea whether [Defendants'] decision was 'well-reasoned' and therefore likely to endure."[135]

Defendants' inconsistent and seemingly confused implementation of the revised publication policy also casts doubt on their future conduct.  Defendants now provide locally-purchased magazines for inmate consumption; however, it is not entirely clear to the Court how or if Defendants have circulated these publications among the Jail's population.  It appears the Jail originally purchased six to seven magazines on a monthly basis for distribution among the twelve cell blocks, but it now purchases

---

[133] Bench Trial Transcript, 81: 12-16.

[134] *Id.* at 81:19-23.

[135] *Harrell*, 608 F.3d at 1266-67 ("[I]f a governmental entity decides in a clandestine or irregular manner to cease a challenged behavior, it can hardly be said that its 'termination' of the behavior is unambiguous.").

twelve magazines—only one for each cell block.[136] Although Defendant Harris testified that these magazines are rotated among the cell blocks on a monthly basis, Captain Minton also stated that there is usually "nothing left" of a magazine at the end of the month.[137]    At the very least, this testimony suggests inconsistent application of the revised publication policy, which in turn suggests that Defendants have not defined their new course of conduct.[138]

Finally, Defendants "continue to press … that the voluntarily ceased conduct should be declared constitutional" and have "never promised not to resume the prior practice."[139]   There is nothing to suggest Defendants will not simply reinstitute their original policy and practices in the future.   Accordingly, on this record, the Court concludes that PLN's request for equitable relief is not moot.

### 2.  Relief

PLN seeks both declaratory relief as to the constitutionality of the challenged policies and injunctive relief as to their enforcement.   The Supreme Court has observed that "[o]rdinarily … the practical effect of [injunctive and declaratory] relief will be

---

[136] Harris Dep., pp. 23-24, 32; Bench Trial Transcript, 59:1-4, 74:20-24, 83:23-25.

[137] Bench Trial Transcript, 60:5-9, 84:7-10.

[138] *See, e.g.*, *Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994) (requests for injunctive and declaratory relief not moot where prison policies at issue "ebbed and flowed throughout the course of the litigation").

[139] *See Jager*, 862 F.2d at 833-34; *see also Harrell*, 608 F.3d at 1267.

virtually identical."[140]   "In order to receive declaratory or injunctive relief, plaintiffs must establish that there was a violation, that there is a serious risk of continuing irreparable injury if the relief is not granted, and the absence of an adequate remedy at law."[141]  In addition, the Court must tailor PLN's relief in accordance with the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626.   In pertinent part, the PLRA provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.[142]

The decision to grant or deny relief is an action of equitable discretion by the Court.[143]

Based on the violations outlined above and the nature of PLN's injury, the Court grants PLN's request for declaratory relief.   While some incidental inhibitions of First Amendment and Fourteenth Amendment rights may be afforded an adequate remedy at law, the type of broad, direct conduct in this particular case cannot be cured by an

---

[140] *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 930-31 (1975).
[141] *Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000)
[142] 18 U.S.C. § 3626(a).
[143] *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).

award of monetary damages alone.[144]  Accordingly, the Court hereby **DECLARES** that Defendants' absolute prohibition on inmates' individual receipt of publications violates the First Amendment to the United States Constitution.  The Court also **DECLARES** that Defendants' notice and appeal policy, which only applies to postcards, violates the Fourteenth Amendment to the United States Constitution.

In light of these declarations, the Court concludes that injunctive relief is neither necessary nor appropriate.[145]  "At the conclusion of a successful federal challenge to a … statute or local ordinance [or policy], a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary."[146]  This course of action provides PLN complete relief without requiring the Court to become "enmeshed in the minutiae of prison operation."[147]

## CONCLUSION

After considering the evidence and applicable law, the Court makes the Findings of Fact and Conclusions of Law as stated herein.  The Court **DIRECTS** the Clerk of Court to enter Judgment as follows:

(1)     In favor of Defendants on PLN's First Amendment claim as to Defendants'

---

[144] *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

[145] *See, e.g., Spellman*, 142 F. Supp. 2d at 1326.

[146] *Doran v. Salem Inn*, 422 U.S. 922, 931 (1975) (material in brackets added).

[147] *Bell v. Wolfish*, 441 U.S. 520, 562 (1979).

postcard-only policy.

(2)    In favor of PLN on its First Amendment claim as to Defendants' original

publication policy and PLN's Fourteenth Amendment due process claim.

a. The Court **DECLARES** that Defendants' absolute prohibition on inmates'

receipt of publications through the mail violates the First Amendment to the

United States Constitution.

b. The Court also **DECLARES** that Defendants' notice and appeal policy, which

only applies to postcards, violates the Fourteenth Amendment to the United

States Constitution.

In light of the foregoing, the Court will promptly schedule a jury trial to

determine the value of PLN's damages as to its procedural due process claim.

**SO ORDERED**, this 26th day of August, 2014.

S/ C. Ashley Royal
C. ASHLEY ROYAL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

BBP/ssh